IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff-Respondent, | § | |
| | § | |
| V. | § | CRIMINAL ACTION NO. H-95-142-13 |
| | § | CIVIL ACTION NO. H-04-300 |
| EDUARDO MORENO | § | |
| | § | |
| | § | |
| Defendant-Movant. | § | |

## MEMORANDUM AND RECOMMENDATION

Before the Magistrate Judge in this federal habeas corpus proceeding pursuant to 28 U.S.C. § 2255 is Movant Eduardo Moreno's § 2255 Motion to Vacate, Set Aside or Correct Sentence (Document No. 5245), [1] Movant's Memorandum in Support of § 2255 Motion to Vacate, Set Aside or Correct Sentence (Document No. 5294), Movant's Notice of Judicial Cognizance (Document No. 5410), the Government's Answer and Motion for Summary Judgment (Document No. 5295), Movant's Response to the Government's Motion for Summary Judgment (Document No. 5341), and the Government's Reply to Movant's Response to the Government's Motion for Summary Judgment (Document No. 5355).  After reviewing the parties' submissions, the record of the proceedings before the District Court in the underlying criminal case, and the applicable case law, the Magistrate Judge RECOMMENDS, for the reasons set forth below, that the Government's Motion for Summary

---

[1] Eduardo Moreno's Motion to Vacate, Set Aside or Correct Sentence can be found at Document No. 1 in Civil Action H-04-300, and at Document No. 5245 in Criminal Action H-95-142. References hereafter will be to the criminal document numbers unless otherwise indicated.

Judgment (Document No. 5295) be GRANTED, that Movant's § 2255 Motion to Vacate, Set Aside

or Correct Sentence (Document No. 5245) and Notice of Judicial Cognizance (Document No. 5410)

both be DENIED, and that this § 2255 proceeding be DISMISSED.

## I.     Procedural History

Movant Eduardo Moreno ("Moreno"), who is currently in the custody of the United States

Bureau of Prisons, is seeking federal habeas corpus relief under 28 U.S.C. § 2255.  This is Moreno's

first attempt at § 2255 relief.

On October 10, 1996, Moreno and seventy-eight co-defendants were charged in a 197 count

sixth superseding Indictment, which arose out of a drug-trafficking organization headquartered in

Starr County, Texas.  (Document No. 19).  The superceding indictment charged various defendants

with narcotics distribution, money laundering, conspiracy to evade currency reporting requirements,

failure to file tax forms, aiding and abetting the use of a communication facility, aiding and abetting

travel in foreign and interstate commerce, conspiracy to travel in aid  of a racketeering enterprise,

conspiracy to obstruct justice, obstruction of  justice, and continuing criminal enterprise.  Moreno

was implicated in 24 of those counts.  Moreno pleaded guilty, pursuant to a written Plea Agreement,

to conspiracy to possess with intent to distribute 1,000 kilograms of more of marijuana, in violation

of §§ 841(a)(1), 841(b)(1)(A), and 846 (count one), and to money laundering offenses in violation

of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2 (counts 168-176).  (Document No. 2762).  Under the written

Plea Agreement (Document No. 2762), Moreno waived his right to a direct appeal, agreed to

cooperate with the Government as the written plea agreement provided for a potential sentencing

departure under Section 5K1.1 of the Sentencing Guidelines if the Government concluded that

Moreno had provided substantial assistance, and agreed to make a full and complete disclosure concerning assets subject to forfeiture by the Government.  The Government, in exchange for Moreno's plea, agreed to file a motion for departure under § 5K1.1 if Moreno complied, as determined by the United States, with his agreement and fully cooperated; agreed to inform the Court of the nature, value, timeliness, and extent of Moreno's cooperation if he in fact so cooperated; agreed not to institute further criminal charges against Moreno in the Southern District of Texas for crimes committed prior to the signing of the written plea agreement with the exception of perjury, false statements, crimes of violence, and obstruction of justice, and agreed to dismiss the remaining counts against Moreno at sentencing.  In addition, the Plea Agreement set forth the penalty for the offenses to which Moreno agreed to plead guilty as follows:

> 7. The defendant understands that the sentence to be imposed is within the discretion of the sentencing judge.  If the Court should impose any sentence from the minimum mandatory up to and including the maximum established by statute, the defendant agrees that he will not, for that reason alone, seek to withdraw his guilty plea or pursue an appeal and will remain bound to fulfill all of the obligations under this plea agreement.

> 8.  The defendant understands that the defendant's sentence will be imposed in accordance with the *Sentencing Guidelines and Policy Statements.*  The defendant nonetheless acknowledges and agrees that the Court has jurisdiction and authority to impose any sentence within the statutory minimum or maximum set for the offense to which the defendant pleads guilty.  The defendant is aware that Title 18, United States Code, Section 3742 affords a defendant the right to appeal the sentence imposed.  Knowing that, the defendant waives the right to appeal the sentence or the manner in which it was determined or on any ground whatsoever.  This agreement does not affect the rights or obligations of the United States as set forth in Title 18, United States Code, Section 3742(B).

> 9.  In agreeing to this waiver, the defendant is aware that a sentence has not yet been determined by the Court.  The defendant is also aware that any estimate of the probable sentencing range under the sentencing guidelines that the defendant may have received from the defendant's counsel, the United States or the Probation Office, is a prediction, not a promise, and is not binding on the United States, the

Probation Office or the Court.  The United States has not and does not make any promises or representation as to what sentence the Court will impose.  The Defendant having been advised of the uncertainty in estimating the sentence to be imposed, knowingly waives the right to appeal that sentence in exchange for the concessions made by the United States in this plea agreement.  Defendant agrees that paragraphs 10, 11 and 12 are applicable to this paragraph.

*** 

General Provision:

2.  The defendant understands that sentencing is imposed in accordance with the Sentencing Guidelines and Policy Statements and that the penalty for a violation of Title 21, United States Code, Section 846 and 841 is a minimum of ten years imprisonment to a maximum of life imprisonment and a fine of not more than $4,000,000.00.  In addition to the term of imprisonment, the Court shall impose a term of supervised release of at least 5 years.  The penalty for a single violation of Title 18 U.S.C. 1956(a)(1)(B)(i) is [a] term of imprisonment up to 20 years and a fine of not more than $500,000 or twice the value of the property involved whichever is greater.  In addition to the term of imprisonment, a term of supervised release of not more than three years may be imposed by the Court.  A mandatory special assessment of $100.00 per count for a total of $1000.00 shall be imposed at sentencing.  Therefore, the defendant can be sentenced to a possible sentence of life in prison plus 180 years, 32 years supervised release and a [fine] of $8,500.00.

The defendant also acknowledges and understands that if he should violate the conditions of any period of supervised release which is imposed as part of his sentence, then the defendant may be imprisoned for the entire term of supervised release without credit for time already served on the term of supervised release prior to such violation in addition to the term of imprisonment imposed at sentencing.  The defendant cannot be placed on probation or have the imposition or execution of the sentence suspended.  Further, the defendant is not eligible for parole. (Document No. 2762).

At Moreno's May 28, 1998, Rearraignment hearing, the Court engaged in an extended colloquy to ensure that Moreno had reviewed the written Plea Agreement, and had discussed it with his attorney, and also that he understood the charges against him, the maximum penalties, the rights he was waiving, including the right to appeal, the factual basis of the plea, and the manner in which his sentence would be calculated. (Document No. 2761, Transcript of Rearraignment Hearing,

Document No. 4225).  With respect to Moreno's understanding of the plea agreement including the waiver of his right of appeal, the maximum penalties, and the calculation of his sentence, the following exchanges took place between Moreno and the Court regarding Moreno's understanding of the plea agreement and the manner in which his sentence would be calculated:

> The Court: And have you gone over the Indictment and the case in general with Mr. DeVictoria, your attorney?
>
> Defendant: Yes, Ma'am.
>
> The Court: Are you fully satisfied with the counsel, representation and advice given to you in this case by Mr. De Victoria as your attorney?
>
> Defendant: Yes, Ma'am.
>
> ***
>
> Ms. Lombardino: Pursuant to Rule 11(e)(1)(B), the Defendant agrees to plead to count one, which charges a conspiracy to possess with the intent to distribute, and the distribution of, 1,000 kilograms or more of marijuana; and to counts 168 through 176, each charges an individual violation of Title 18, United States Code, Section 1956 and  (2), laundering of monetary instruments.
>
> The Defendant agrees to cooperate and testify, as set forth in the written Plea Agreement.  The United States reserves the sole right in its sole judgment and discretion to file a 5K1.1 motion based upon substantial assistance should the United States, in its sole discretion and judgment, determine that such a motion is appropriate.
>
> The United States makes no promise to the Defendant regarding sentencing other than those specifically set forth in the written Plea Agreement.  The Defendant waives the right to appeal for any reason, including but not limited to the United States not filing the 5K1.1 motion and/or the court not granting the motion if it is filed, and/or the Court rejecting any sentencing recommendation, if any is made.
>
> Furthermore, the Defendant agrees that he will not be permitted to withdraw his guilty plea should, (a) the United States not file, or the sentencing court not grant, the 5K1.1 motion for departure, if filed, and/or the sentencing court rejects any sentencing recommendations, if there are any, made by the United States.

The Defendant agrees to voluntarily forfeit and does forfeit his interest in the assets listed in Exhibit A. At the request of the United States the Defendant agrees to voluntarily take whatever steps and perform whatever acts are necessary to transfer ownership, title, custody of the exhibit A assets, as set forth in more detail in paragraph 9A of the plea agreement. The Defendant acknowledges that these assets are forfeited under Title 21, Section 853(A)(1), (A)(2), and/or 881, and/or 18, United States Code, Sections 1982 and/or 981.

The Defendant agrees to execute any waiver necessary to accomplish any purpose contemplated by the agreement. Should the United States determine the Defendant has not complied with or violated any term as set forth in the written Plea Agreement, the Defendant's plea and sentence will stand and the United States is released from its obligations under the agreement. Should that occur, the Defendant may be prosecuted for or prosecution may be reinstated for any and all violations of law as well as forfeitures the Defendant has committed, including but not limited to counts contained in the current indictment.

The Defendant waives the statute of limitations and all disclosures and documents made by the Defendant can be used against him.

If the United States files a 5K1.1 motion for departure, the United States will advise the sentencing court of the nature, extent and value and timeliness of the Defendant's cooperation. The United States reserves the right to carry out its responsibilities under guideline sentencing, as set forth in the written Plea Agreement. Following the sentencing and the Defendant's compliance with all terms and conditions of the written plea agreement, the remaining counts of the indictment against the Defendant will be subject to a motion to dismiss.

The Defendant agrees that sentencing will be deferred until the United States determines that substantial assistance has been rendered and/or completed.

***

The Court: Have you had a chance to read and go over that written Plea Agreement with Mr. De Victoria, your attorney?

Defendant: Yes, your Honor.

The Court: And do you feel like you understand what the written plea agreement says?

Defendant: Yes, Ma'am.

The Court: Do you have any questions about it right now that you need to ask or anything about it that you feel like you don't understand?

Defendant: No, Ma'am.

***

The Court: All right.  The penalties.  I'm going to go over the penalties that you're facing as a result of your plea of guilty this afternoon.

The penalties for count one, which is a conspiracy to possess with intent to distribute marijuana of 1,000 kilograms or more, is imprisonment for a mandatory minimum of ten years up to life imprisonment, a fine of up to $4 million, and at least five years supervised release.

For counts 168 through 176, each count charges an individual violation of laundering of monetary instruments and each count carries a penalty of imprisonment of up to 20 years, a fine of up to $500,000 or twice the value of the property involved in the transaction, and supervised release of not more than three years.  And then for each of the counts there would be a $100 special assessment.  And since you're pleading guilty to ten counts, that would be a total of $1,000 for the special assessments.

***

I also want to explain to you about this mandatory minimum, because although I'll be talking about the sentencing guidelines in just a minute, and I know you and Mr. De Victoria have talked about how these sentencing guidelines apply in your case, when we have a mandatory minimum statute that is involved, Congress has basically told the Judges that they have to impose a sentence, no matter what the guidelines say, they have to impose a sentence of a certain minimum amount.  And in your case you're pleading guilty to an offense which calls for a mandatory minimum sentence of ten years, which means that I would have to give you a sentence of at least ten years, no matter what the guidelines say.

Do you understand that that's how this mandatory minimum statute works?

Defendant: Yes, your Honor.

The Court: All right.  Under the Sentencing Reform Act of 1984, the United States Sentencing Commission has issued guidelines for judges to follow to determine what a sentence will be in a criminal case.  Have you and Mr. De Victoria talked about how those sentencing guidelines may apply in your case?

7

Defendant: Yes, your Honor.

The Court: Do you understand that I will not be able to determine what your sentence is and, in fact, I have absolutely no idea what your sentence will be until after we have gone through this next process, which is a process in which a probation officer will make an independent assessment of your case, an independent evaluation of both you and also the crime.  And that evaluation is being made not for the government, it's not being paid for you, it's being made for me, to assist me in sentencing.

After the investigation and evaluation have been made, the probation officer will write a presentence report and you and Mr. De Victoria will be given a copy, and the government will be given a copy.  And then you and Mr. De Victoria will be given an opportunity to make any objections you may have to the facts found in the report and also any recommendations as to how the sentencing guidelines may apply in your case.  The government will also be given an opportunity to make any objections.

We will then have a sentencing hearing and at that sentencing hearing I will listen to any arguments you may have, or Mr. De Victoria, or the Government may have, concerning any objections you may have, or the Government may have.  I will also listen to any motions that the Government may be filing or any recommendations that the government may make.  I'll listen to any motions that Mr. De Victoria may file in your behalf or any recommendations that Mr. De Victoria may make.

After I've heard all of the issues that have been raised at the sentencing hearing, after I have ruled on any objections that have been made or any motions that are made, I will then make a determination of how the guidelines apply in the case and what your sentence will be.  And if at that time I make a determination that the sentence that I feel is the right sentence is more severe than the sentence that you and Mr. De Victoria may have talked about today or recently, that you think you might get — in other words, if my sentence if harsher than the one you think you're going to get now — you will still not be able to withdraw your plea of guilty at the time of sentencing.

Do you understand that?

Defendant: Yes, Ma'am.

***

The Court: Now, normally, if you had not — if you were not going to enter into a plea agreement this afternoon, you and the government, under some circumstances, would have the right to appeal any sentence that I impose.  But by entering into this written plea agreement you are waiving or giving up your right to appeal any sentence that I impose.

8

Do you understand that?

Defendant: Yes, Ma'am.

***

The Court: All right.  Ms. Lombardino, would you tell me what it is the government is prepared to prove if we went to trial in this case.

Ms. Lombardino: Yes, your Honor.  Beginning in the mid 1980s and continuing through 1996, a group of individuals, the coheads of which are Pedro Moreno, Ricardo Riojas, Ramiro Riojas, Roberto Riojas, Cesar Moreno, Sr., Eduardo Moreno, Luis Moreno, Larzaro Moreno and Rudolfo Arias, formed an organization whose goal it was to possess for distribution and to distribute marijuana to customers located in places such as Houston, Texas; Chicago, Illinois; Detroit, Michigan; Ohio; or in Atlanta, Georgia, and elsewhere throughout the United States.

During its tenure, a hundred-plus persons joined in this illegal purpose.  Primarily, the organization operated in Starr County, Texas, with sales with persons and operations in the Houston, Texas, area.

Generally, the marijuana would be imported to the United States in the Starr County, Texas, area where it would be stored temporarily until its transportation by vehicles to persons in Houston, Chicago, Detroit, or other states throughout the United States. It would be sold and the currency from the sale of the marijuana would be returned to the heads of the Moreno-Riojas organization in Starr county, Texas, and Houston, Texas.  The members of the organization would be paid for their participation.

All in all, the organization was responsible for the distribution or possession for distribution in excess of three quarters of a million pounds of marijuana.

It was also part of the conspiracy that when any member was arrested in connection with the marijuana trafficking activities of the organization, the heads of the organization would hire and/or pay attorneys and/or post bond and/or provide currency from the sale of marijuana to post bail and provide currency for the support of families of their arrested coconspirators.  In exchange, the arrested coconspirators were expected to and did conceal the organization's marijuana trafficking activities and did conceal the other members' participation in those criminal activities, particularly the identification of the heads of the organization and their closest coconspirators.  This enabled the enterprise to continue its marijuana trafficking activities.

Additionally, vehicles, properties, and other assets were purchased which were used to transport, distribute and/or store marijuana, and were also used to afford a source of influence over the marijuana trafficking enterprise. Assets were also purchased with drug money and the source and nature of the funds, using actual owners of the funds used, were concealed in a variety of manners.

As it relates to Eduardo Moreno, Eduardo Moreno, along with his brothers, which include Lazaro Moreno, Cesar Moreno, Sr., Luis Moreno and Pedro Moreno, were also involved in the planning and coordination of the purchase of several vehicles which were then used to transport marijuana for the organization. The purchase price of these vehicles totaled approximately $91,000 and was used by other coconspirators, such as Guadalupe Carvajal, Ismael Munoz, Alberto Soza, Martin Garcia-Garcia, and other coconspirators to transport loads of marijuana.

On at least four occasions marijuana was seized by law enforcement authorities from these vehicles which belonged to the organization and was purchased with proceeds of drug trafficking. As an example, one of these vehicles was utilized by Martin Garcia-Garcia. This vehicle, a grey Ford truck bearing license 5678 BW was identified in an F.B.I. undercover operation while it was transporting approximately a thousand pounds of marijuana.

At the direction of the Mor– prior to that time, at the direction of the Moreno brothers, including this Defendant, money was provided and was used to purchase this vehicle, was supplied by the Moreno brothers. According to the State of Texas Department of Motor Vehicles' records, Martin Garza (sic) purchased this vehicle from Sam's motors. Their records show that the price of the vehicle was $17,812.59, and was paid in the following manner: on April 25th of 1990 a $5,000 cash payment; April 27 of 1990, a $3,062.59 cash payment; on April 27, 1990, a cashier's check in the name of M. Garze, G-A-R-Z-E, for $9,000. According to the records of the Laredo Bank, the cashier's check was purchased with $9,000 in United States currency.

As the way in which these items were purchased, no currency transaction report was filed by the I.R.S.– was filed with the I.R.S. by any domestic institution nor was any 8300 filed by an trade or business.

Once again, the records of Sam's Motors and the Department of Motor Vehicles, Martin Garze, G-A-R-Z-E, listed his address as P.O. Box 126, Roma, Texas, utilizing a false identity to conceal the source of the funds used to purchase the vehicle and the ownership of the vehicles. According to the records of the U.S. Postmaster, the box holder of P.O. Box 126 in Roma, Texas, was and is Delfino Garcia. According to those same records, Perissa (sic) Garcia, who is the wife of Martin Garcia, receives mail at that address.

This address is also used on another occasion in order to purchase a piece of property that was used to store, package and transport marijuana. This property is referred to as a coyote ranch. This land was particularly purchased by Ricardo Riojas and Pedro Moreno, and was called in a nominee's name, namely, Rudolfo Garcia, a relative of Martin Garcia-Garcia and Maria G. Moreno, who is the wife, the current wife, of Cesar Moreno, Sr., the Defendant's brother, and a coconspirator, and the sister of Martin Garcia-Garcia.

This vehicle was eventually turned over to Maria G. Moreno following the delivery of a thousand – of the marijuana to a residence here in Houston, Texas.

Another vehicle that was utilized to transport marijuana and that was purchased by these members of the organization involves a Chevrolet pickup truck which was assigned 6975 BW. It was also purchased with currency supplied by the Morenos and was intended to be used, and was in fact used, to transport marijuana. The price of this vehicle was $17,022.53. Once again, according to the records of Sam's Motors, the vehicle was paid for on July 2, 1990, with $3,140 dollars in United States currency, and then two cashiers checks were later tendered in the amounts of 6,000 and $7,860. Once again, the way in which the transaction was structured enabled – or, the financial institutions did not follow — did not file a CTF, nor did Sam's Motors, as a trade or business, file an 8300 with the Internal Revenue Service.

This money was delivered to this particular coconspirator who purchased this vehicle on the behalf of the Morenos at a meeting that took place on the hill, which is the residential area of this defendant as well as the other Moreno brothers, and it was attended by all of the Moreno brothers, including Pete, Luis, Lazaro and Cesar, and at least three other coconspirators.

This conspirator, coconspirator, was also told by the Moreno brothers that he is not to buy cashier's checks over $10,000 because anything over $10,000 would be reported to the I.R.S. As a result, this coconspirator purchased two cashier's checks from Citizen's State Bank on the same day. One cashier's check was under the coconspirator's name and the other was in the coconspirator's wife's name. According to the records of Citizen State Bank, the cashier's checks were both purchased on July 6, 1990, and one was in the amount of seventy-eight sixty and one was in the amount of $6,000. As stated before, no CTR is filed by the bank, which is a domestic financial institution.

Examples of currency that have been seized from this particular defendant, as well as the Moreno brothers, involves on at least two occasions examples where drug proceeds were seized by law enforcement officials. On September 6, 1990, approximately $29,980 United States currency was seized from another coconspirator by a Refugio County Deputy while this coconspirator was traveling on U.S. 77. This

money was destined for the Morenos as money that represented money from the sale of marijuana.

Mario Jasso, another coconspirator, was also arrested while transport— was also stopped and $31,430 was also seized from him.  This was money that Mario Jasso had picked up from a marijuana customer here in Houston, Texas, and was transporting back to deliver to this defendant and the other Morenos.  This, too, was money from the sale of marijuana that had been supplied by the organization.

By way of illustration only, the following are examples of the defendant's possession with intent to distribute and the distribution of marijuana:

On June 1, 1992, 4,747 pounds of marijuana was seized at a location, a ranch in Starr county, which belonged to Leonardo Munoz.  According to members of this organization, this ranch was used by all of the Moreno brothers, including this defendant, to load and store marijuana.  The Morenos were paying Leonardo Munoz for the use of the ranch for this purpose.  At the time of the seizure the persons who were packaging the marijuana and guarding the marijuana told border patrol agents that they had been hired by Pete Moreno and Lazaro Moreno to perform these functions.

Another example of marijuana that was seized by law enforcement that was supplied by this defendant and other members of the organization involved an episode that occurred on March 7, 1992.  DPS officers seized approximately a thousand pounds of marijuana from a vehicle– this is Texas License 6975 BW– which was driven by another coconspirator who worked for the Moreno brothers.

A second vehicle, which was operated by Martin Garcia-Garcia, which contained approximately 2,074 pounds of marijuana, was allowed to continue on once the marijuana was identified in the truck and they were allowed to deliver the marijuana to the residence in Houston, Texas, in order to identify the location to which this marijuana and the persons to which – to whom this marijuana was to be distributed.  Thereafter, the marijuana was seized by law enforcement officials at the residence in Houston, Texas.  According to the owner of the residence to which the marijuana was delivered and from which it was seized, the same individual – that is, Martin Garcia-Garcia, had also on two other occasions delivered marijuana to this residence for distribution in the Houston, Texas, area.

On August 28, 1993, 1728 pounds of marijuana, which once again belong– which was being stored at a particular location by this defendant and the other Moreno brothers, was seized pursuant to a search warrant from the residence of a coconspirator.  The Moreno brothers supplied money to build an underground

basement in which to store this marijuana.  On at least three occasions marijuana was stored and distributed from his location.

The other two episodes involved approximately a thousand pounds of marijuana each.

As to the money laundering counts, your Honor, and the items which are listed in the notice of criminal forfeiture, which is Exhibit A, I'm going to refer to them by their notice number.

Number 43.  The residence of Eduardo Moreno was constructed on approximately five – excuse me– .5 acres, which according to a warranty deed, was acquired on November 24, 1987.  According to the records of the Starr County Appraisal District, it shows that the residence was constructed in 1998.  One arrest record shows that the Defendant, Eduardo Moreno, had, during that year, available income of $22,097.50.

The Court: Ms. Lombardino, let me interrupt.  You said '98.  You meant '88?

Ms. Lombardino: Oh, I'm sorry, '88.  In 1988, yes, your Honor.

Appraisal records show that the residence was – the same appraisal records show that the residence was valued at between a hundred thousand and $120,000.  This residence was constructed with proceeds from Eduardo Moreno's involvement in marijuana trafficking activities and was also a location where the proceeds of marijuana sales were delivered and distributed to other members of the organization.  The area where Eduardo Moreno built his residence was also the area where he, together with his coconspirators and brothers, Luis Moreno, Lazaro Moreno, Cesar Moreno, Sr., and Pedro Moreno, built their residences or had their property.  This area which was, in effect, in the compound, is referred to by the drug – by the Moreno Associates, drug associates, as The Hill.  The Hill is a compound area which is accessed through an electronic gate.  The Hill formed a compound which contained all of the residences of the Morenos where the Morenos had held meetings to discuss the marijuana trafficking activities, where marijuana has been delivered, and where the proceeds of the sale of marijuana was delivered.

Property number 25.  This property is known as L&V Moreno Used Equipment Sales, a front business of Lazaro Moreno, and was used to conceal proceeds from, as well as a location to plan and coordinate his marijuana trafficking activities.  According to the Starr County, tax roles, approximately .342 acres, where this business was located, was purchased in 1989.  There is no deed of record for this property with the Starr County officials.  No deed was filed in order to conceal ownership of the property.  Starr County Appraisal District Records show that the property is owned by Eduardo Moreno and his brother, Lazaro Moreno.  The value

of the property is $40,840, according to the records of the Starr County Appraisal District.   Improvements were valued at $30,970 and consist of a commercial prefabricated metal warehouse which is constructed on the property.

Records of the I.R.S. show that Lazaro Moreno for that year had available income of approximately $19,000 in 1989 when he acquired the property and Eduardo Moreno had available income of approximately $6,000 in 1989, when he acquired this particular property.

Counts 168 and 169, and this also relates to property number 11 in the indictment. Lazaro and Eduardo Moreno negotiated for the purchase of approximately 213.19 acres of land for $170,552.   This land was paid for in United States currency.   On October 22, 1991, 60,000 in United States — $60,000 in U.S. currency was delivered by the Morenos to the seller.   According to the records of First National Bank of Rio Grande City, the currency was deposited into the seller's account and a CTR filed with the Internal Revenue confirms the currency deposit.   On October 24, 1991, an additional $110,552 in United States currency was made – payment was made for the land and, once again, the money was deposited into the seller's account and, as a result, generated a CTR, which confirms the currency deposits.   Upon the final payment deeds were actually executed on the property on November 4, 1991.

According to the seller, he was told by Lazaro and Eduardo Moreno to put the property in the following names: they are Julio Cesar Sorta Solis, Julia Lee Moreno and Desiree Moreno.   From tax and other records the United States will be able to prove that Desiree Moreno is a minor child of Lazaro Moreno and was nine months old at the time of the transaction.   Eduardo Moreno's wife, Rosinda Sorta Moreno, the name of Julio Cesar Sorta Solis, is a relative of hers.   Julia – excuse me– Julia L. Moreno is a minor child of Lazaro Moreno.   By placing these persons' names on the deeds, this concealed the source of the funds which were used to purchase the property, as well as it shielded Lazaro and Eduardo Moreno as the true owners in their ownership interest in the property.

The seller advised that he had had no contact with any individuals other than the two Moreno brothers.   Records show that Lazaro Moreno had available income for that year of $69,000 in 1991, and Eduardo Moreno had $18,000 of available income for that particular year.

As to counts 170 and 171, and this involves property number 12, it's the purchase of 188.24 acres by Lazaro and Eduardo Moreno for $150,592 in United States currency. According to the seller and bank records, the seller received $102,016 in United States currency from both Lazaro and Eduardo Moreno at Lazaro Moreno's residence as a down payment on the land on December 2, 1999.   The additional $48,576 in United States currency was deposited into the seller's account on February 10, 1992.

14

Once again, the seller was instructed to place this land in the names of Julio Cesar Sorta Solis, Desiree Moreno, Julia Lee Moreno, the minor children of Lazaro Moreno, which once again concealed the source of the funds and both Morenos' ownership interest in the property.

Once again, Lazaro Moreno's available income for 1992 was only $32,000 and Eduardo Moreno's available income for 1992 was $24,000.

As to counts 172 through 176 – and this relates to property number 13 – it involves the purchase of 141 acres of land by Lazaro and Eduardo Moreno for $112,000 in United States currency. Lazaro and Eduardo Moreno negotiated for the purchase of this land. The terms were $80,000 down, with the payment of $32,000 to be paid off over a two-year period. $80,000 in United States currency was delivered to the seller by Lazaro Moreno on April 13, 1992. This is confirmed by bank records as well as a CTR which was filed when the currency was deposited into the seller's account. According to the records, the seller – according to the records, the balance was paid as follows:

On August 18, 1993, another $10,000 in United States currency, which was sent by Lazaro Moreno, was delivered to the seller. On January 24, 1994, $11,000 in United States currency was delivered by an individual at the instruction of both Lazaro and Eduardo Moreno.

On June 8, 1994, $5,000 was delivered by an employee of the Morenos. On August 29, 1994, $6,000 in U.S. currency was delivered in person by Lazaro Moreno.

It was at the last meeting that Moreno provided the names the land was to be titled in, namely, Eduardo Luis Moreno, Eric Moreno, Evial Moreno, Viola Armoral. From tax returns and other records, the United States can prove that Eduardo Luis Moreno is the minor son of Eduardo and Rosinda Moreno. At the time of the transactions he was two years old.

Eric Moreno is also the minor son of Eduardo and Rosinda Moreno. At the time of the transaction he was one year old.

Evial Moreno was yet to be born at the beginning of the transaction, but at the time the deeds were executed he was two years old.

Viola Moreno is the wife of Lazaro Moreno. Once again, according to the seller, he had no contact with any of the individuals other than Eduardo and Lazaro Moreno. And, once again, the Moreno brothers effectively concealed the source of the funds and each ownership's interest in the property.

15

\*\*\*

The Court: Mr. Moreno, you are pleading guilty to count one of the Indictment which is a conspiracy count.  Can you tell me in your own words what it is that you did as part of this conspiracy.

Defendant: Sold, transported marijuana to Houston.

The Court: Transported and sold marijuana to Houston from —

Defendant: From Roma.

The Court: From Roma.  Ms. Lombardino told us some details about your participation in some of these transactions.  Do you have any disagreement with what she said she can prove that you did in terms of what she told us about what you did, the details that she told us, and the specific transactions?

Defendant: No, your Honor.

The Court: Now, the money laundering parts of the Indictment, 168 to 176, she has also given us a great number of details.  Is that what you did?  Do you have any quarrel with what she said she can prove concerning those transactions?

Defendant: No.

The Court: You bought that property for cash and put it in the names of your nieces and nephews or you own children or you wife or your sister-in-law, things of that kind?

Defendant: Yes, your Honor.

The Court: And they were proceeds of drug transactions?

Defendant: Yes, your Honor.

\*\*\*

The Court: Mr. Moreno, normally at this point I would set a sentencing time for you, but because of the unique nature of this case, I'm going to wait until all of the defendants have either plead or we've had a trial.  (Transcript of Rearraignment, Document No. 5225, pp. 2-6, 8-13, 17-33).

16

Prior to sentencing, a Pre-sentence Investigation Report ("PSR") was prepared (Document No. 4238), to which Moreno filed written objections.[2] (Document No. 4180).  Pursuant to the PSR, Moreno's sentence was calculated as follows:  (1) In calculating Moreno's base offense level, because Moreno had been convicted of a violation of 21 U.S.C. § 841(a)(1) and 846, and was held accountable for 89,213.6 kilograms of marijuana, U.S.S.G. § 2D1.1 directed a base offense 38.[3]  (2) Because the organization used the Leonides Munoz Ranch, where numerous firearms were seized

---

[2] Moreno objected to information regarding the offense conduct, PSR ¶ 4, 6, 7, 9; and information concerning his relevant conduct, PSR ¶ 13, 15-18, 20-22, 24-31, 35-36, 40, 42-45, 50-51, 56, 58, 62, 64, 67, 78, 82.  In addition, Moreno objected to the two level increase for the firearms violation.  According to Moreno, he never instructed anyone to carry any firearms.  Also, he objected to the four level increase for his role in the offense.  According to Moreno, he was not an organizer or leader.  Instead, Moreno argued he was a manager for the organization and as such, his offense level should be adjusted upward by two levels.  Further, Moreno objected to the two level increase for obstruction of justice because he paid no money to Martin Garcia-Garcia or instructed Martin Garcia-Garcia to flee.  Lastly, Moreno argued that he should have been given a three level adjustment for acceptance of responsibility.  According to Moreno, he was the first defendant to accept responsibility for his actions, the first to debrief, was truthful, and cooperated with the forfeiture of his assets.  Moreno urged the Court to consider a sentencing departure under § 5K1.1. (Document No. 4180).

[3] Moreno's relevant conduct was described in the PSR, paragraphs ¶¶ 13-88.  (Document No. 4238).  The information was obtained by the probation officer from interviews with case agents, the investigative reports, document review, Title III interceptions, and the debriefings of cooperating individuals.  Morenos' involvement was summarized as follows in the PSR:

> In summary, the defendant is deemed to have occupied a leadership role in the offense, which clearly involved more than 100 criminal participants.  The defendant is held accountable for the distribution of 196,679 pounds or 89,213.6 kilograms of marijuana and the laundering of $3,874,653.10 (this total includes $170,000 referenced under the Obstruction of Justice section). This money laundering total is considered a conservative estimate and did not include most of the monies paid to the escorts, fees paid for the use of the ranch routes, storage facilities, nor the majority of the drug proceeds earned by this organization, etc.  Numerous firearms were seized at the marijuana storage/packaging site located on the Leonides Munoz Ranch. Additionally, a load driver David Recio was in possession of a firearm at the time he was transporting a load of marijuana.

17

along with 4,747 pounds of marijuana, because a load driver, David Recio, was found in possession of a 9 mm firearm while transporting a load of marijuana for Moreno and his brothers, and because the firearms were connected to the drug trafficking activities and were reasonably foreseeable, pursuant to U.S.S.G. § 2D1.1(b)(1), Moreno's base offense level was increased by two levels. (3) Because Moreno was an organizer/leader of a criminal activity that involved over five criminal participants, his offense level was adjusted upward by four levels pursuant to U.S.S.G. § 3B1.1(a). (4) Because Moreno obstructed justice by providing monies to coconspirator, Martin Garcia-Garcia, so that Martin Garcia-Garcia could flee to Mexico, and avoid prosecution in a related drug case, Moreno's base offense level was adjusted upward by two levels pursuant to U.S.S.G. § 3C1.1.[4] (5)

---

[4] With respect to the two level upward adjustment for obstruction of justice, PSR ¶ 90 states:

On February 14, 1995, Martin Garcia-Garcia and Luis Hinojosa were indicted in the United States District Court, Southern District of Texas, McAllen Division under docket 7:95CR0029 for conspiracy to possess with intent to distribute marijuana. This case was based upon the delivery of marijuana by Martin Garcia-Garcia to Hinojosa on March 7, 1992, previously referenced. Martin Garcia-Garcia was arrested on this case on February 15, 1995 and his bond was set for $200,000. On February 22, 1995, Martin Garcia-Garcia was bonded out of jail after posting $20,000 deposit in the registry of the court. The Moreno brothers provided the monies for the bond and attorney representation by Abraham "Chic" Kazen, III. Lazaro Moreno delivered the monies to Clarissa Garcia, the wife of Martin Garcia Garcia. The instant investigation subsequently revealed that the Moreno brothers (Pete, Eduardo, Luis and Lazaro), Victor Zamaro and Mario Jasso discussed paying Martin Garcia-Garcia $150,000 to flee to Mexico and not return. On September 5, 1995, Martin Garcia-Garcia failed to appear and an arrest warrant was issued. Cooperating co-conspirators verified that Martin Garcia-Garcia was paid with proceeds from Pete Moreno, Cesar Moreno, Sr., Eduardo Moreno, Lazaro Moreno and Luis Moreno and fled to Mexico. Martin Garcia-Garcia remains a fugitive in the instant offense as well.

With an adjusted base offense level of 46, and with a criminal history of category 1, Moreno had a guideline sentence of life.[5]  (Document No. 4238).

Moreno was sentenced on March 30, 2001.  (Document No. 4248, Transcript of Sentencing Hearing, Document No. 4816).  The record shows that Judge Harmon considered and  rejected all of Moreno's objections to the PSR, as follows:

The Court: And have you talked with Mr. De Victoria about [the PSR]?

Defendant: Yes, ma'am.

***

The Court: You have talked with Mr. De Victoria about this presentence report, correct?

Defendant: Yes, ma'am.

The Court: And you feel like you understand everything in it?

Defendant: Yes, your Honor.

The Court: Do you have any question[s] that you would like to ask about it at this point?

Defendant: No, your Honor.

The Court: Now, Mr. De Victoria filed a number of objections to the report, and I am going to be dealing with those in just a few moments; but I want to find out from you if you, Mr. Moreno, have any objections that you would like to make that Mr. De Victoria did not make to the presentence report.

Defendant: No, your Honor.

_____

[5] According to the PSR, Moreno was not awarded a sentencing adjustment for acceptance of responsibility because an adjustment for obstruction of justice suggested Moreno had not accepted responsibility for his criminal conduct and because his statement overly minimized his drug trafficking conduct since he claimed to have begun his drug trafficking activities in 1988. (Document No. 4238, PSR ¶¶ 91, 92, 101).

\*\*\*

The Court: The probation officer has indicated in her response that she personally has interviewed a vast number of those confidential informants and other informants and that she has talked to the agents and has reviewed the other evidence in the case, and her factual assessment of the case she has put in the report; and she believes that these sources are credible sources and that what she said in her report is an accurate rendition of what happened in the case.

And since these are credible sources and the probation officer believes this information to be credible, I am going to overrule your objections to the factual matters that you have objected to in the presentence report.

Now let's go to the acceptance of responsibility.  I believe the probation officer did not give Mr. Moreno acceptance of responsibility because there was a finding of obstruction of justice; is that not correct?  And in addition there was–

Probation Officer: Minimization, your Honor.

The Court: Minimization.

Mr. De Victoria: According to that, your Honor, I would like to point out that Mr. Moreno is a person of very few words, he doesn't like to talk.  He was the first one to be debriefed in this case; and when Mrs. Lombardino debriefed him, every time she asked him, he always answered, and he was accurate and truthful.

And I think because of that, that should be taken into consideration and maybe considered for the acceptance of responsibility.

The Court: Ms. Lombardino.

Ms. Lombardino: Your Honor, I am not sure what they mean by "first."  I don't think he was the first person to debrief in this case about the activities which are listed in the indictment.

I would say he is a man of few words; however, I also don't think that what he tells the United States– and I have to say there are on occasions we did have a situation where he was not answering our questions, he refused to answer questions when we were getting into particular matters.  And also he has, as I think the probation officer has pointed out just even in his objections, has minimized, continues to minimize not only his conduct but that of some of his other co-conspirators.

And I guess the Court is looking at the statement that was submitted by the defendant; and that clearly does, when you compare it to what he did, minimize his role and what he did in the offense.

The Court: Of course, we have the obstruction.

Ms. Lombardino: Well, that goes without saying.

The Court: That pretty much does away with acceptance.  If you have obstructed justice, then you can't get acceptance unless there is some extraordinary circumstance.  And given the fact that he has minimized his participation, I think there is very little reason for me to give him acceptance, so that's why I am not giving him acceptance.  I am going to overrule your objection.

You also have objected to adjustment for aggravating role; and clearly, as the probation officer pointed out, the defendants involved over a hundred participants, and he certainly was high on the list of people who were directing and organizing this, so I think I am going to overrule that objection as well.

I don't want to skip any of these.

Ms. Lombardino: The only other specific one I recall, your Honor, was the firearms violation, which is in Paragraph 96.

The Court: Now, firearms I don't know how I could not find that he reasonably knew these people would have firearms.  There were firearms in many different places and many different people carrying firearms.  So, I mean, they were there.  So, as the probation officer points out in the factual recitation, there were firearms there.  So, I am going to overrule your objection to Paragraph 96 as well.

***

Right.  Obstruction of justice.  I was pretty much relying on the factual findings in the probation officer's presentence report to find that there was obstruction of justice.  She debriefed several of the co-conspirators, I mean, she interviewed many of the co-conspirators who were debriefed, and their information was considered to be reliable and credible; it checked out.

Ms. Lombardino: Your Honor, I think one of the things she also pointed out an obstruction was actually Mr. Moreno admitted to that.

The Court: Right.  He admitted that Mr. Garcia was one of the load drivers and that he had a lot to gain from Mr. Garcia's flight from justice; and he also admitted it was

common for the Moreno brothers to provide attorney's fees, bond money, which is what they did for Mr. Garcia.

I believe the probation officer is correct in accepting the obstruction of justice, and I will overrule your objection to Paragraph 90.

***

Defendant: Yes, your Honor.  I want to take this opportunity to apologize to the Honorable Court, the government, and my beloved wife and children, to my mother and sisters for the wrongdoing I did; and I can't say what I did, but I have now improved in real life everything, your Honor.  I am very repentant.  I am the father of three sons.  I ask the Honorable Court to have mercy for me and my family. Again, I say I am repentant, your Honor, and to accept my apologies.  Thank you, your Honor.

Your Honor, I accept my responsibility of what I did and pled guilty for what you told me on May 28, 1998, your Honor.  I accepted my responsibility because the government told me to accept and they would give me a fair acceptance, your Honor.

Your Honor, I began using cocaine from about 1982 and to 1996 about two grams a week that drug.

And, your Honor, that I asked my lawyer to subpoena the informant, and he did not do it, your Honor.

The Court: Well, if your lawyer had subpoenaed the informants, the government would have filed a motion to quash those subpoenas, and I would have granted that motion because that's not allowed.  I mean, you can't subpoena the informants, so I am sure that's why he did that because he wouldn't be successful in getting the informants in here.

Sentencing is different from a trial, you understand?

Defendant: Yes.

The Court: I found that you had not accepted responsibility not because you didn't say that you had committed a crime, but rather, under the guidelines, acceptance of responsibility is not favored if a person has obstructed justice, which I also found you had done by helping Mr. Garcia escape from the United States.

So, the fact that you admitted that you had done some criminal acts is not enough under the guidelines to get the two points for acceptance of responsibility, so that's why I did not give those to you.

\*\*\*

The Court: In your last objection, Mr. De Victoria, you requested the Court do consider a downward departure based on substantial assistance under 5K1.1. And of course, the government has to file that in order for me to be able to consider that; and the government hasn't filed one, and I don't know if you want to say anything about that.

Ms. Lombardino: I did say something a little bit earlier that alluded to that; that in our sole discretion we have elected not to file a 5K1 on Mr. Moreno's behalf. His debriefing and the information he has subsequently provided began deminimizing his role and his involvement in the offenses and that of other co-conspirators. That was not considered substantial.

We met with the agents and we went thoroughly through [ ] all the information that had been provided. He had been given three opportunities to, at least three– a little more, I think more than that because we also got some other information after that as well to debrief. And based on the totality, [it] did not render substantial assistance. In the opinion and sole discretion of the United States, he did not provide substantial assistance to us in the prosecution of other individuals. (Transcript of Sentencing Hearing, Document No. 4816, pp. 2-11, 14-15).

The Court sentenced Moreno life imprisonment.  According to Judge Harmon, a life sentence was appropriate given that "Mr Moreno was one of the leaders of a major drug trafficking organization that operated successfully in South Texas for over 10 years and was responsible for the distribution of tens of thousands of kilograms of marijuana." (Transcript of Sentencing Hearing, Document No. 4816, p. 11).  The Court imposed a term of life on count 1 and a term of 240 months as to each of counts 168-176, with all terms to run concurrent.  In addition, the court imposed a  five year term of supervised release on count 1, and three years terms of supervised release on each of counts 168-176, with all terms of supervised release to run concurrent.  Also, the Court imposed a fine of

$25,000.00, and imposed a special assessment of $550.   (Document No. 4248, Transcript of Sentencing Hearing, Document No. 4816, pp. 11-14).  Judgment was entered on April 5, 2001. (Document No. 4259).

Moreno appealed his conviction and life sentence to the Fifth Circuit Court of Appeals. Moreno challenged the calculation of his guideline sentence.  According to Moreno, the Court erred by enhancing his sentence for obstruction of justice, denying a reduction for acceptance of responsibility, and by enhancing his sentence for possessing a firearm in connection with a drug trafficking offense.  In response, the United States moved to dismiss Moreno's appeal based on the ground that Moreno, as part of his plea agreement, waived his right to appeal.  The Government argued that Moreno's plea and waiver were voluntary given the Court's admonishments to Moreno concerning his plea and waiver, and Moreno's express and unequivocal statements that he understood those provisions of his written Plea Agreement. (Document No. 5355, Attachment B, Government's Motion to Dismiss Appeal and Alternatively Motion for Seven Day Extension of Time).  Persuaded by the Government's contentions that Moreno's plea and waiver were voluntary, the Fifth Circuit Court of Appeals granted the Government's Motion to Dismiss.  (Document No. 5065). Because Moreno did not file a petition for writ of certiorari with the United States Supreme Court, his conviction became final upon the expiration of the deadline to file such a petition, or January 26, 2003.  On January 23, 2004, within one year of his conviction being final, Moreno timely filed a    § 2255 Motion to Vacate, Set Aside, or Correct Sentence. (Document No.5245).  Moreno raised the following grounds for review:

A.  Ground One:
Attorney's erroneous guilty plea advice and assessment of the consequences of the case was ineffective assistance because counsel recommended guilty plea which resulted in a life sentence.

Supporting facts:
a) But for counsel's erroneous advice and failure to properly assess the amount of sentence exposure that defendant faced, there is a reasonable probability that defendant would <u>not</u> have plead guilty and would have proceeded to trial.

b) Counsel's failure to correctly apply sentencing guidelines was ineffective assistance of counsel when he erroneously advised defendant that if he accepted the plea he faced only 188 to 235 months imprisonment, when in fact he faced a LIFE sentence which was the sentence imposed.

A Memorandum of Law in Support of the above grounds will be forthcoming within 30 to 45 days.

B.  Ground Two:
Attorney's faulty guilty plea advice was ineffective assistance of counsel because counsel recommended guilty plea which resulted in Defendant's waiver of his right to appeal and deprived Defendant of a fair and meaningful Appellate review.

Supporting facts:

a) trial counsel failed to inform defendant of waiver of his right to appeal.

b) Defendant's waiver of right to appeal was unknowing and uninformed.

A Memorandum of Law in Support of the above grounds will be forthcoming within 30 to 45 days).  (Document No. 5245, pp. 3-4).

On March 30, 2004, Moreno filed a memorandum in support of his § 2255 motion (Document No.

5294), in which he raised the following issues:

1.  Whether trial counsel's erroneous advice and gross misrepresentations of the consequences of the guilty plea induced Movant to unknowingly and involuntarily plead guilty and thereby deprived Movant of effective assistance of counsel as guaranteed under the Sixth Amendment.

2.  Whether trial counsel's erroneous explanation of the consequences of the Plea Agreement induced Movant to plead guilty and thereby prejudiced Movant with a life sentence of imprisonment.

3.  Whether Movant was denied Due Process when the District Court ordered the United States Attorney's Office to prepare factual summaries to be used by the Probation Office in preparing the Presentence Investigation Report ("PSR").

4.  Whether sentencing counsel's failure to: (A) challenge the amount of marijuana attributed to Movant; (B) properly argue against the PSR finding for an offense level increase for obstruction of justice; (C) argue against an increase for possession of firearms in connection with a drug offense; and (D) properly argue for a reduction of offense levels for acceptance of responsibility, deprived Movant of effective assistance of counsel at Sentencing and a significantly less harsh sentence.

5.  Whether an evidentiary hearing and discovery is necessary to resolve factual matters in and out of the record, expand the record and to significantly aid the Court in the decisional process.  (Document No. 5294, p. 2).

In support of his claims, Moreno submitted his sworn affidavit, in which he states:

Attorney Ivan R. DeVictoria, was the trial counsel appointed by the U.S. District Court to represent me in my criminal case matter and trial, when I first had contact with counsel in court, he stated that he would represent me loyal[ly], and made a hard fight to win my case, and/or he would get me good deal if I would "plea guilty," so the second time that counsel contacted me at county jail, counsel verbally explained to me that I would have to be debriefed before, and/or to get a good deal from the government, and this was the only manner to get lesser term of imprisonment and the only statements that I would have to state and/or make, was the truth about what my actions were, and this is what I did, told the truth, and counsel stated that if I told the truth, counsel would guarantee me 10 to 20 years, and that the government would consider that of my taking full responsibility for my actions, during sentencing.

Counsel never informed me about the possibility that I could receive [a] life sentence, and during the four (4) years I only saw counsel those first two times, one at the court, one at the county jail, and 2 more times after that, when I was at the County Jail and the F.D.C. [Houston].  No more than that, and because of the reasons of his absen[ce] because counsel clearly misadvised me into admitting my guilt, and knew that I would be exposed to [a] possible life term of imprisonment.

Whenever I phone counsel at his office, he's never there, and this was every time I called, he was never there, after he advised me to admit guilty, I was willing to take this case to trial, before counsel kept constantly telling me to plea guilty, it was in my

26

best interest; counsel did to me, exactly what the counsel did in the *Glover v. United States*, 531 U.S. 198, 148 L.Ed.. 2d 604 (2001), counsel misadvised petitioner in that case, which resulted in that petitioner receiving a longer term of imprisonment resulting from counsel's misadvice, the same has occurred herein this case matter before th Court of Appeals, which this affidavit in support provide;

When counsel finally answered me, he would tell me that everything was fine, knowing that I had no knowledge of the law nor criminal procedures, and that he has made a deal on 10 to 20 years prison term, when counsel did not have any knowledge of what information by P.S.R. contained to be utilized during the sentencing [phase] of my case[.]

When I requested counsel to file pretrial motions, he stated that he had filed motions, that he did not need me to tell him anything, so when I did receive a copy of my P.S.R., it contained false, uncorrected information by the P.S.R. preparer and the government counsel, and when I informed counsel that I wanted to withdraw the plea, because I didn't sign for a life sentence, but I stipulated to 10 to 20 years as stated to me by counsel, that 10 to 20 years was all the time that I would have receive in this case, a life sentence was not the deal that counsel had been informing me that I would receive for four(4) years during his tenure on my case, and never once, did counsel tell me that he knew what term of imprisonment that the U.S. attorney was preparing to submit to the sentencing court, far from the 10 to 20 years that counsel had promised me, to get me to plea guilty, when all the time, counsel was conspiring with the government counsel to deprive me of my substantial rights to a fair trial proceedings and effective assistance of counsel, and I kept requesting counsel to file a motion and/or inform the government and the court that I wish[ed] to withdraw the guilty plea, well before the sentencing phrase, counsel would not do as I requested him of withdrawing the plea, counsel kept telling me no, because I would get the 10 to 20 years, he guaranteed it![.]

I kept informing counsel that I wished to withdraw the guilty plea and exercise my constitutional rights and proceed to trial, before I allow the government to get me a life sentence without exercising my constitutional protections, counsel would not tell me no!

Counsel kept telling me that I was going to receive 10 to 20 years and he and the government's counsel had talked it over with the Court and agreed to the 10 to 20 years term of imprisonment, and this went on for four (4) years, before I went before the sentencing phrase of this case matter, and I received the life sentence!, plus 20 years, and counsel did nothing, because he was in this conspiracy with the government's counsel to deprive me of my substantial rights.

Just before my sentencing date, counsel visited me at the F.D.C. Houston, and told me that he was ready for the big fight, and the next day, when the Judge imposed the life plus 20 years, counsel did not open his mouth in my defense, he did not make one objection as to the alleged 10 to 20 years that he stated that I was going to [receive] for accepting responsibility, when all the time, it became evident that defense counsel had conspired with the government's counsel to deprive me of my constitutional protected rights and substantial rights to a fair trial proceedings and/or rule 11 proceedings.

Counsel did after sentencing, [instruct] me that if I ever needed a letter from him stating that he was ineffective, that he would write me one, this was also before the sentencing phrase which resulted in a life plus 20 years, as oppose[d] to the 10 to 20 years[.] [A]fter sentencing, counsel did not come to the cellblock holding area, nor did counsel come to F.D.C. Houston[.] [A]fter the sentencing, I never saw counsel again nor heard from him, the only words [were] about his payment[.] I am a first time offender, I have no understanding of the law, the procedures of a criminal proceedings, and all because of the lies and false misleading advice of counsel, I pleaded guilty, when I could have went to trial, and maybe a probability may have won, and/or sentenced to a lesser term of imprisonment than I received.  (Document No. 5294, Exhibit 1).

In response, the Government has filed a Motion for Summary Judgment (Document No. 5295).

According to the Government, Moreno's claims are refuted by the record, which clearly establishes that Moreno's plea was knowing and voluntary, that he was aware of the maximum penalties, that he understood that any prediction of a sentence by counsel was a prediction and not a promise, and that he waived his right to appeal. The Government argues that counsel's assessment of Moreno's sentencing exposure was guided by Moreno's willingness to secure a departure from the applicable guidelines by cooperating with the Government in its investigation.  In addition, the Government argues that Moreno's guilty plea was found to be voluntary as evidenced by the Fifth Circuit's dismissal of Moreno's appeal based on the plea waiver.  Moreno has filed a Response to the Government's Motion for Summary Judgment.  (Document No. 5341).  The Government, in turn, has filed a Response to Moreno's Reply with Clarification.  (Document No. 5355).  Finally, Moreno

has filed a Notice of Judicial Cognizance (Document No. 5410), in which he suggests that his sentence is contrary to the holding of the United States Supreme Court in *Blakely v. Washington*, 542 U.S. 296, 524 S.Ct. 2531 (2004).[6]

## II. Motion to Amend to assert *Blakely/Booker* claim

On September 13, 2004, Moreno filed a Notice of Judicial Cognizance (Document No. 5410), in which he suggests that he should be allowed to argue that his sentence enhancement was unconstitutional in light of *Blakely*. Moreno's Notice of Judicial Cognizance has been construed as a Motion for Leave to Amend/Supplement his § 2255 motion.

Federal Rule of Civil Procedure 15 governs amended and supplemental pleadings, and the law is clear that Rule 15 applies to amendments of § 2255 motions. *See United States v. Saenz*, 282 F.3d 354. 356 (5th Cir. 2002) ("Every circuit that has addressed this issue agrees the [AEDPA's] one year statute of limitations does not render Rule 15 inapplicable to federal habeas proceedings."). "Under Fed.R.Civ.P. 15(c), a district court may in its discretion, permit an amendment which clarifies or amplifies a claim or theory in a timely filed § 2255 petition after AEDPA's one year statute of limitations has expired." *United States v. Thomas*, 221 F.3d 430, 433-434 (3rd Cir. 2000). Conversely, an amendment under Rule 15(c) should not be allowed where the movant seeks to add an entirely new claim or new theory of relief. *Id.* "An amended habeas petition does not relate back (and thereby escape AEDPA's one year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Mayle v. Felix*, ___U.S.___, 125 S.Ct. 2562 (2005). Because *Blakely/Booker* is a new theory of relief, supported

---

[6] Because of the intervening decision by the United States Supreme Court in *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738 (2005), which applied *Blakely* to the Federal guidelines, the Court refers to both decisions as *Blakely/Booker*.

by facts that differ in type and time from his original § 2255 motion, Moreno is not entitled to amend his § 2255 motion under Rule 15.

Moreover, even assuming that Moreno's claim under *Blakely/Booker* related back to his § 2255 motion, Moreno should not be allowed to amend his original § 2255 motion because *Blakely/Booker* does not apply retroactively to cases on collateral review.  As a result, the proposed amendment would be futile.

Moreno argues that the district court's sentencing determination is contrary to the Supreme Court's decisions in *Blakely v. Washington*, 542 U.S. 296, 524 S. Ct. 2531 (2004) and *United States v. Booker,* 543 U.S.220, 125 S.Ct. 738 (2005) because the Court, and not a jury, enhanced his sentence.  In *Blakely*, the Supreme Court invalidated the State of Washington's sentencing scheme, whereby a judge could possibly sentence a defendant to a punishment beyond a statutory range on the basis of judicially determined facts.  *Id.* at 2538.  In doing so, the Supreme Court applied the rule in *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), which requires that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  The Supreme Court in *Blakely* expressly declined to state whether its decision applied to the Federal Sentencing Guidelines.  *Id.*

The Supreme Court, in its intervening decision, *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738 (2005), extended its holding in *Blakely* to the Federal Sentencing Guidelines, and concluded that there was "no distinction of constitutional significance between the Federal Sentencing Guidelines" and the state sentencing scheme at issue in *Blakely* and, in keeping with its earlier decision in *Apprendi*, stated:  "Any fact (other than a prior conviction) which is necessary to

support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Id.,* 125 S.Ct. at 756. To remedy the guidelines' Sixth Amendment problem, the Supreme Court severed and excised 18 U.S.C. § 3553(b)(1), which required mandatory application of the guidelines. *Id.* at 756-57, 765. As a consequence, the guidelines are now advisory in all cases. *Id.* at 757. Because *Blakely* and *Booker* were decided after Moreno's conviction in the instant case became final, it must be determined as an initial matter whether *Blakely/Booker* should be retrospectively applied. The Supreme Court has not stated whether the rule announced in *Blakely* and *Booker* apples retroactively to cases on collateral review.   However, the Fifth Circuit addressed this issue as to initial § 2255 motions, and has concluded that *Booker* does not apply retroactively to an initial § 2255 motion. *United States v. Gentry,* 432 F.3d 600 (5th Cir. 2005). Because *Booker* does not apply retroactively in initial § 2255 proceedings, Moreno is not entitled to relief under *Blakely/Booker,* and his Notice of Judicial Cognizance (Document No. 5410) should be DENIED as untimely and futile.

## III.  Time-barred claims

Moreno has raised in his Memorandum of Law in Support of Motion to Vacate, Set-Aside, or Correct Sentence under 28 U.S.C. § 2255 (Document No. 5294), which was filed on March 30, 2004, claims that were not raised in his timely filed § 2255 motion.

On April 24, 1996, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") was enacted.  With the enactment of AEDPA, 28 U.S.C. § 2255 now specifically provides for a one-year statute of limitations:

A 1-year period of limitation shall apply to a motion under this section.   The limitation period shall run from the latest of–

(1)     the date on which the judgment of conviction becomes final;

(2)     the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from filing by such governmental action;

(3)     the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4)     the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255.  Because Moreno filed the instant motion after the effective date of AEDPA, the provisions of the statute apply.

Here, Moreno's conviction became final for purposes of § 2255(1) on January 26, 2003, the last day on which he could have filed a petition for writ of certiorari with the United States Supreme Court.  *See* Sup.Ct.R. 13.1 ("a petition for certiorari ... is timely when it is filed ... within 90 days after entry of the judgment'); *Griffith v. Kentucky*, 479 U.S. 314, 321 n. 6 (1987 ("By 'final,' we mean a case of which a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied."); *United States v. Gamble*, 208 F.3d 539 (5th Cir. 2000) (§ 2255's statute of limitations begins to run when the time for filing a petition for certiorari expires).  The one-year limitation period began to run on January 26, 2003, the day his conviction became final, and expired one year later on January 26, 2004.

Here, Moreno's § 2255 motion was received and stamped filed on January 23, 2004. In connection with his motion, Moreno filed a Memorandum in Support of his claims on March 30, 2004. In his Memorandum of Law, Moreno raises claims that were not included in his timely filed § 2255 motion. Under these circumstances, all of Moreno's subsequently raised ineffective assistance of counsel claims relating to sentencing, such as that counsel failed to challenge the amount of marijuana attributable to him; failed to argue against an increase based on obstruction of justice; failed to argue against an increase of his offense level based on possession of firearms in connection with a drug offense; and failed to properly argue for a three level reduction of his offense level for acceptance of responsibility, and his claim that he was denied due process because the Court ordered the United State's Attorney office to prepare factual summaries that were used by the probation office in preparing the PSR, are untimely under § 2255(1), and are subject to dismissal absent a showing that an alternate date for commencement of the limitations period should be applied under § 2255(2)-(4), or that the limitations period should be equitably tolled.

None of the alternate provisions for the commencement of the limitations period applies. Moreno has not alleged that he was in any way impeded from including these claims in his timely filed § 2255 motion. Also, Moreno has not shown that the *facts* underlying his effective assistance of counsel claims and due process claim could not have been discovered through the exercise of due diligence by the time his conviction was final.

As for the applicability of equitable tolling, rare and exceptional circumstances may warrant the application of equitable tolling principles to a late filed § 2255 motion to vacate, set aside or correct sentence. *United States v. Patterson,* 211 F.3d 927 (5th Cir. 2000). Equitable tolling, however, is not available if the petitioner does not act diligently in attempting to meet the one year

limitations deadline. *Coleman v. Johnson,* 184 F.3d 398, 402 (5th Cir. 1999), *cert. denied,* 529 U.S. 1057 (2000). In addition, the Fifth Circuit has approved of equitable tolling in very limited circumstances, "'principally where the plaintiff is actively misled by the defendant about the cause of action or is prevented in some extraordinary way from asserting his rights.'" *Fierro v. Cockrell,* 294 F.3d 674, 682 (5th Cir. 2002) (quoting *Coleman,* 184 F.3d at 402); *See also  Davis v. Johnson,* 158 F.3d 806, 811 (5th Cir. 1999), *cert. denied*, 526 U.S. 1074 (1999) (Inconsistent ruling by the district court constituted exceptional circumstances which warranted the application of equitable tolling principles); *United States v. Patterson,* 211 F.3d 927 (5th Cir. 2000) (Rare and exceptional circumstances existed to warrant equitable tolling where the Movant was under mistaken impression as to filing deadline, where that mistaken impression was furthered by the District Court); *United States v. Wynn,* 292 F.3d 226, 230 (5th Cir. 2002) (remanding case for rehearing on equitable tolling where the petitioner alleged "he was deceived by his attorney into believing that a timely § 2255 motion had been filed on his behalf"). In contrast, the Fifth Circuit has disapproved of the application of equitable tolling for circumstances which are "garden variety claims of excusable neglect." *Lockingbill v. Cockrell,* 293 F.3d 256, 265 (5th Cir. 2002).

Here, given the absence of any facts in the record that would constitute a rare or exceptional circumstance to warrant equitable tolling, equitable tolling of the limitations period is not available. Accordingly, Moreno's ineffective assistance of counsel claims relating to sentencing and his due process claim are time-barred. Moreno's claims do not clarify, amplify, or expand upon his earlier ineffectiveness claims or challenge to his guilty plea. Because the newly asserted claims  are separate and distinct from his other ineffectiveness claims and challenge to his guilty plea, including the waiver of his right to a direct appeal, Moreno's new claims do not relate back to the timely filed

§ 2255 motion.  "An amended habeas petition does not relate back (and thereby escape AEDPA's one year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Mayle v. Felix*, ___U.S.___, 125 S.Ct. 2562 (2005); *United States v. Espinoza-Saenz*, 235 F.3d 501, 505 (9th Cir. 2000) (ineffective assistance of counsel claims do not relate back merely because they arose from the same trial or sentencing proceeding).[7]

## IV.  Guilty Plea Claims

Claims of ineffective assistance of counsel are generally measured by the standard of *Strickland v. Washington*, 466 U.S. 668 (1984).  Under *Strickland*, a petitioner must be able to show that his counsel was deficient and that the deficiency prejudiced him to the extent that a fair trial could not be had.  *Strickland*, 466 U.S. at 687.  Deficiency is judged by an objective reasonableness standard, with great deference given to counsel and a presumption that the disputed conduct is reasonable.  *Id.* at 687-88.  The prejudice element requires a petitioner to prove that absent the disputed conduct of counsel, the outcome would have been both different and more favorable.  *Id.* at 694-95.  Under *Strickland*, a petitioner must establish both deficiency and prejudice prongs to be entitled to habeas relief.  The failure to establish either deficient performance or prejudice makes it unnecessary to examine the other prong.  *United States v. Seyfert,* 67 F.3d 544, 547 (5th Cir. 1995).

---

[7] Assuming arguendo that Moreno's ineffective assistance of counsel claims amplified and clarified his earlier timely filed claims, upon this record he would not be entitled to relief.  The record shows that counsel raised all the objections urged by Moreno, in writing and later at the Sentencing Hearing.

With respect to Moreno's claims that his due process rights were violated in the preparation of the PSR, again, the record belies his contentions.  The PSR was prepared by the probation officer, who worked for the Court.  Both the Government and Moreno were given the opportunity to file written objections to the PSR.

Under the deficiency prong of *Strickland*, judicial scrutiny of counsel's performance is "highly deferential" and "a strong presumption" is made that "trial counsel rendered adequate assistance and that the challenged conduct was the product of reasoned trial strategy." *Wilkerson v. Collins*, 950 F.2d 1054, 1064-65 (5th Cir. 1992), *cert. denied,* 509 U.S. 921 (1993) (citing *Strickland*).  To overcome the presumption of competence, the petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690.  Under the prejudice prong of *Strickland,* a petitioner must be able to establish that absent his counsel's deficient performance, the result of his trial could have been different.  "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691.

Constitutionally effective assistance of counsel under *Strickland* is not errorless counsel.  The determination of whether counsel has rendered reasonably effective assistance turns on the totality of facts in the entire record.  Each case is judged in light of the number, nature, and seriousness of the charges against a defendant, the strength of the case against him, and the strength and complexity of his possible defense. *Baldwin v. Maggio*, 704 F.2d 1325, 1329 (5th Cir. 1983), *cert. denied,* 467 U.S. 1220 (1984).   The reasonableness of the challenged conduct is determined by viewing the circumstances at the time of that conduct. *Strickland,* 466 U.S. at 690.  "We will not find inadequate representation merely because, with the benefit of hindsight, we disagree with counsel's strategic choices." *Kitchens v. Johnson*, 190 F.3d 698, 701 (5th Cir. 1999) (quoting *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997)).  The court's role "under § 2255 is not to audit decisions that are within the bounds of professional prudence." *United States v. Molina-Uribe*, (No. 04-40534), 429 F.3d. 514 (5th Cir. 2005), *pet. cert. filed*, (Oct. 28, 2005)(05-7320).  In addition, conclusory

allegations of ineffective assistance of counsel do not raise a constitutional question in a federal habeas petition. *Miller v. Johnson,* 200 F.3d 274, 281 (5th Cir. 2000), *cert. denied*, 531 U.S. 849 (2000) (citing *Barnard v. Collins,* 958 F.2d 634, 642 (5th Cir. 1992); *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983)).

With respect to guilty pleas, the prejudice requirement "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). Thus, Moreno "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.* As to the specific examples of ineffective assistance of counsel which Moreno cites to in support of his ineffectiveness claims, such as that he was mislead about the length of his sentence and that he had not been advised that the Plea Agreement would not allow for a direct appeal, the record either affirmatively shows that Moreno's counsel was not deficient or there is no evidence that the alleged errors prejudiced Moreno within the meaning of *Strickland.*

Moreno claims that the guilty plea was not knowing because it was based on counsel's misrepresentations about a likely sentence of ten to twenty years. According to Moreno, his counsel failed to take into account the effects of relevant conduct in calculating his guideline sentence. Moreno contends that he would not have pleaded guilty had he known that the conduct of dismissed counts and that of coconspirators would be considered for sentencing purposes. Moreno further contends that counsel failed to advise of possible increases to his base offense level for obstruction of justice and a participant's possession of a firearm, and he further argues he pleaded guilty based on counsel's assurance that he would receive a three level reduction for acceptance of responsibility. In addition, Moreno argues that counsel erred by recommending a plea that resulted in the waiver

of his right to appeal.  According to Moreno, because counsel failed to inform him of the appeal waiver, his waiver was unknowing and uninformed.

"Solemn declarations in open court carry a presumption of verity, forming a formidable barrier in any subsequent collateral proceeding.  *United States v. Cervantes*, 132 F.3d 1106, 1110 (5th Cir. 1998) (quoting *Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977)).  However, a defendant such as Moreno may obtain habeas relief on the basis of misrepresentations as to what a sentence will be, notwithstanding statements made in open court, by showing the exact terms of the alleged promise, when, where and by whom the promise was made, and the precise identify of an eyewitness to the promise.  *Cervantes*, 132 F.3d at 1110 (citing *Harmason v. Smith*, 888 F.2d 1527, 1529 (5th Cir. 1989)).  Consequently, absent independent evidence that disputes Moreno's own testimony which he gave during his Rearraignment, his ineffective assistance of counsel claims based on counsel's erroneous estimate of his sentencing exposure and failure to advise of appeal waiver fail.  Here, because Moreno has failed to come forward with credible, independent evidence, which would dispute his sworn statements at his Rearraignment hearing, his claims fail.

Moreover, regardless of whether Moreno's attorney knew of, or discussed with him, his relevant conduct and the application and effect of relevant conduct in calculating his sentence, and that, as part of his plea, Moreno was waiving his right to appeal, given Moreno's sworn statements at his Rearraignment hearing, which are entitled to the presumption of truthfulness, Moreno has not shown that he was unaware that he could be sentenced to life imprisonment, and has not shown that he was unaware that he had waived his right to a direct appeal.  At his Rearraignment Hearing, Moreno acknowledged, under oath, that he could receive a life sentence, that no representations or promises had been made as to his sentence, that *only* the Court would determine his sentence he

would receive after receiving and reviewing the PSR and objections made by Moreno to the PSR, and that he could not withdraw his plea if his sentence was more severe than he expected. Moreno repeatedly acknowledged that he understood that no one could tell him with specificity the length of sentence which would be imposed by the Court and that his sentence would be determined by the Judge *only*. Similarly, the written Plea Agreement stated he could receive a sentence of between ten years and up to life imprisonment, that his sentence would be imposed in accord with the Sentencing Guidelines, that the Court could impose *any sentence* within the statutory maximum, that the sentence to be imposed was within the discretion of the court, and that imposition of the maximum sentence would not be grounds to withdraw his plea. Even if Moreno's counsel had erroneously represented that he would receive a sentence of ten to twenty years by entering into the plea agreement, Moreno, nonetheless, was aware when he entered the Plea Agreement and at the time of his Rearraignment hearing, that his sentencing exposure was a mandatory minimum sentence of 10 years or 120 months, and could be life imprisonment. Similarly, the record shows that Moreno was aware that under the written Plea Agreement, that he had waived his right to appeal. In addition, Judge Harmon questioned Moreno about the waiver, and Moreno unequivocally stated he understood.

In sum, Moreno has failed to demonstrate that his guilty plea, including appeal waiver was not knowing, voluntary, and intelligent, and has likewise failed to overcome the presumption under *Strickland* that "counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689. (quotations omitted). Even if counsel had predicted a much lesser sentence, Moreno's reliance on that sentencing estimate

39

would have been unreasonable given the numerous warnings he received at his Rearraignment that the maximum sentence for the drug conspiracy to which he was pleading guilty to was life, and that he was waiving his right to appeal.  By pleading guilty, Moreno had the potential for a less harsh sentence given that there was a chance for a 5K1.1 motion, and a three level reduction for acceptance of responsibility.  In contrast, had Moreno gone to trial, it is highly likely that the jury would have found him guilty, based on the evidence, and there would have been no chance of the Government filing a 5K1.1 motion, or a reduction for acceptance of responsibility.

## V.  Conclusion and Recommendation

Based on the foregoing, it is

RECOMMENDED, that Movant's § 2255 Motion to Vacate, Set Aside or Correct Sentence (Document No. 5245), and Notice of Judicial Cognizance (Document No. 5410) all be DENIED, and that the Government's  Answer and Motion for Summary Judgment (Document No. 5295) be GRANTED, and that this § 2255 proceeding be DISMISSED.

The Clerk shall file this instrument and provide a copy to all counsel and unrepresented parties of record.  Within 10 days after being served with a copy, any party may file written objections pursuant to 28 U.S.C. § 636(b)(1)(C), Fed.R.Civ.P. 72(b), and General Order 80-5, S.D. Texas.  Failure to file objections within such period shall bar an aggrieved party from attacking factual findings on appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Ware v. King*, 694 F.2d 89 (5th Cir. 1982), *cert. denied*, 461 U.S. 930 (1983); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982) (en banc).  Moreover, absent plain error, failure to file objections within the ten day period bars an aggrieved party from attacking conclusions of law on appeal.  *Douglass v. United Services*

40

*Automobile Association*, 79 F.3d 1415, 1429 (5th Cir. 1996).  The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208.

Signed at Houston, Texas, this 5th  day of  May, 2006.


Frances H. Stacy
United States Magistrate Judge